1
2
3
4                                              **E-FILED on**     9/25/08     
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                         SAN JOSE DIVISION
11

12 EMPLOYERS INSURANCE OF WAUSAU,       No. C-06-03002 RMW

13          Plaintiff,                    ORDER ON CROSS-MOTIONS FOR
                                            SUMMARY JUDGMENT AND ON
14       v.                              CALIFORNIA WATER SERVICE
                                            COMPANY'S MOTION TO STRIKE
15 CALIFORNIA WATER SERVICE
COMPANY, a California Corporation,       **[Re Docket Nos. 87, 102, 104, 106, 108, 247]**
16
         Defendant.
17
18

19        The instant action was commenced by Employers Insurance of Wausau ("Wausau") to

20 resolve an insurance coverage dispute arising out of lawsuits brought against its insured, California

21 Water Service Company ("Cal Water"), by the California Department of Toxic Substance Control

22 ("DTSC") in the Eastern District of California. Cal Water provides water service in various

23 California locations.  Wausau issued general liability insurance policies to Cal Water providing

24 coverage from 1956 to 1988.  Defendant Cal Water has filed three motions for summary judgment

25 seeking adjudication that: (1) Wausau has a duty to defend Cal Water in the DTSC lawsuits and is

26 not entitled to reimbursement for the costs it has incurred in defending Cal Water; (2) the claims by

27 DTSC against Cal Water are covered claims under the Wausau policies and that Cal Water is

28

entitled to recover what it paid to comply with settlements it entered into with the DTSC; and (3) Wausau is precluded from raising certain coverage defenses.

Plaintiff Wausau has filed two motions for summary judgment requesting a determination that: (1) coverage is excluded under the applicable policies' pollution exclusion, that Wausau cannot be liable for breach of the implied covenant of good faith and fair dealing and that there is no basis for a claim for punitive damages; and (2) there is no coverage because it is excluded by the care, custody and control exclusion in the policies and that coverage does not extend to the type of costs Cal Water has incurred pursuant to the consent decrees it has entered into in the underlying lawsuits.

Cal Water also seeks to strike certain affirmative defenses raised by Wausau.

# I. BACKGROUND

## A. The Underlying Actions

This action arises out of claims brought against Cal Water by DTSC in two consolidated actions in the Eastern District of California. Cal Water supplies the residents and businesses of the Chico area with water for all purposes, including drinking. Cal Water has drilled numerous wells in the Chico area, which it operates and maintains.

In 2002, three actions were initiated in the Eastern District in which the DTSC alleged Cal Water along with a number of other defendants had contaminated Chico's groundwater. *Cal. Dep't of Toxic Substances Control v. City of Chico*, C-02-00442 LKK DAD; *Century Indem. Co. v. Olson*, C-02-2390 LKK DAD; *Cal. Dep't of Toxic Substances Control v. Payless Cleaners*, C-02-02389 LKK DAD (the "Underlying Actions"). These actions are currently before the Honorable Lawrence K. Karlton, who consolidated the *City of Chico* and *Olson* cases, which the parties refer to as the *City of Chico* action. The *Payless Cleaners* case is referred to as the *Payless* action. The *City of Chico* action involves the Central Plume of PCE-contaminated water and Cal Water wells 2, 10, and 21; the *Payless* action concerns the Southwest Plume and Cal Water well 46.[1]

---

[1] Wausau asks the court to take judicial notice pursuant to Federal Rule of Evidence 201 of certain filings in the *City of Chico* and *Payless* actions. *See* Wausau's Req. Jud. Notice Supp. Mot. Summ. J. on Def.'s Counterclaim ("RJN re: Def.'s CC"). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the

1    The complaints in the underlying suits allege that several dry cleaning businesses and

2    property owners released, *inter alia*, perchloroethylene[2] ("PCE") into the soil and groundwater

3    beneath the central business district of Chico.  Cal Water's activities of pumping water and

4    operating, monitoring and shutting down of certain wells affecting the Chico city water supply all

5    purportedly contributed to the dispersal of the contamination in the groundwater.  Cal Water is

6    named as a defendant in each of these actions, and the DTSC seeks to hold the defendants in the

7    actions jointly and severally liable under the Comprehensive Environmental Response,

8    Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, for all costs incurred in

9    response to the alleged releases of hazardous substances.

10    Prior to filing the lawsuits, the DTSC had been in contact with Cal Water regarding the

11    groundwater contamination in Chico.  On January 9, 1996, DTSC sent to Cal Water a "potentially

12    responsible party" or "PRP" letter, asserting that it believed "that past and current operation of the

13    California Water Service (CWS) municipal wells in the City of Chico contributes to the spread of

14    PCE within and around the Central Chico Plume Area."  Decl. of Bryan Barber ("Barber Decl."), Ex.

15    30.  This January 9, 1996 PRP letter concerned Cal Water wells 2, 10 and 21, which Cal Water had

16

17    trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy
cannot reasonably be questioned."  Fed. R. Evid. 201(b); *United States v. Mariscal*, 285 F.3d 1127,

18    1131 (9th Cir. 2002).  The court may take judicial notice of document filed in another court for the
type of information contained in that document, *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir.

19    1990), however, it may not take judicial notice "for the truth of the matters asserted in the other
litigation, but rather to establish the fact of such litigation and related filings."  *Kramer v. Time*

20    *Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  Subject to that limitation, the court will take judicial
notice of the DTSC's complaints in the *City of Chico* and *Payless* actions, and the approval of

21    settlement in the City of Chico action, as well as the motions and declarations in support of the
approval of the consent decree as requested by Wausau.  RJN re: Def.'s CC, Exs. A-I.

22    [2] According to the California Department of Health Services ("DHS"), perchloroethylene is the

23    main solvent used in the dry-cleaning process, and is also used in metal degreasing, during the
production of fluorocarbons, and in some adhesives, aerosols, paints, and coatings.  The DHS

24    provides the following "health hazard summary":

25    The most common effects of overexposure to perchloroethylene are irritation of the
eyes, nose, throat, or skin, and effects on the nervous system similar to the effects of

26    alcohol.  [Perchloroethylene] causes cancer in laboratory animals at exposure levels
close to the level legally allowed in the workplace.  Based on the animal tests, you

27    should treat [perchloroethylene] as a potential human cancer-causing substance.

28    http://www.dhs.ca.gov/ohb/HESIS/perc.htm.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND ON CALIFORNIA WATER SERVICE COMPANY'S MOTION
TO STRIKE
No. C-06-03002 RMW
MAG                                              3

1  learned were contaminated in 1984. DTSC asserted that wells 2 and 10

2  > acted as conduits by allowing PCE to flow from the shallow and intermediate aquifer
3  > into the lower aquifer. This occurred while the wells were running and was enhanced
   > after the wells were taken out of service in 1985 and left in an idle state.
4  > Unfortunately, these wells were not properly closed (decommissioned) until 1991 to
   > prevent the ongoing migration of contaminants from upper to lower aquifers.

5  *Id.* (emphasis in original). The letter also asserted that well 21 "continues to operate within the

6  plume and act as a conduit resulting in additional migration of the plume" and asked that the well be

7  taken out of service and properly decommissioned to prevent the further spread of PCE

8  contamination. *Id.* On March 5, 1996, DTSC sent another letter to Cal Water's attorney, William

9  Bagley, reiterating the position it had taken in its January 9, 1996 letter, that "DTSC believes that

10 two wells in the contaminated plume have acted as conduits exacerbating the contaminant plume

11 during the years that they were left idle." *Id.*, Ex. 31.

12 **B.    The Policies**

13 Wausau issued general liability insurance policies to Cal Water effective from 1956-1988.

14 From January 1, 1972 to January 1, 1986, each of the policies contained a pollution exclusion that

15 provides:

16 > This insurance does not apply:

17 > to bodily injury or property damage arising out of the discharge, dispersal, release or
   > escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases,
18 > waste materials or other irritants, contaminants or pollutants into or upon land, the
   > atmosphere or any water course or body of water, but this exclusion does not apply if
19 > such discharge, dispersal, release or escape is sudden and accidental.[3]

20 Smith Decl. ¶ 6, Ex. 6.

21 The policies issued prior to 1972 did not include a pollution exclusion. The policies issued

22 after 1986 included a pollution exclusion, which is generally referred to as the "absolute pollution

23

24

25

26

---

27 [3] This form of the exclusion is sometimes called the "qualified pollution exclusion." *Travelers Cas. & Sur. Co. v. Superior Court*, 63 Cal. App. 4th 1440, 1448 (1998).

28

exclusion."[4]  For purposes of this action, the parties do not dispute that coverage for the claimed

contamination does not arise under Wausau policies issued after 1985.

### C.    Tender of Defense

Cal Water's insurance broker informed Wausau of the Underlying Suits on December 30,

2002.  Decl. of Fulton Smith ("Smith Decl."), Ex. 1.  Wausau, as the insurer under Cal Water's

general liability insurance policies, agreed to defend Cal Water "subject to a full and complete

reservation of rights to decline coverage, as well as [a] reservation to seek reimbursement from

defendant Cal Water of all defense expense paid by Wausau for the defense of the lawsuits."  Smith

Decl., Exs. 3, 4.  Wausau asserts that it has "paid more $1 million for Cal Water's defense fees of the

DTSC actions," for which it now seeks reimbursement.  Mot. Summ. J. re: Pollution Exclusion,

Docket # 87.

---

[4]  The "absolute pollution exclusion" states that the insurance does not apply:

> (1)    to bodily injury or property damage arising out of the actual, alleged or
> threatened discharge, dispersal, release or escape of pollutants:
>> (a)    at or from premises owned, rented or occupied by the named
>> insured;
>> (b)    at or from any site or location used by or for the named insured
>> or others handling, storage, disposal, processing or treatment of
>> waste;
>> (c)    which are at any time transported, handled, stored, treated,
>> disposed of or processed as waste by or for the named insured
>> or any person or organization for whom the named insured my
>> be legally responsible; or
>> (d)    at or from any site or location on which the named insured or
>> any contractors or subcontractors working directly or indirectly
>> on behalf of the named insured are performing operations;
>>> (i)    if the pollutants are brought on or to the site or
>>> location in connection with such operations; or
>>> (ii)    if the operations are to test for, monitor, clean
>>> up, remove, contain, treat, detoxify or neutralize
>>> the pollutants.
> (2)    to any loss, cost or expense arising out of any governmental direction or
> request that the named insured test for, monitor, clean up, remove, contain,
> treat, detoxify or neutralize pollutants.

> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant,
> including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste
> includes materials to be recycled, reconditioned or reclaimed.

Smith Decl., Ex. 17.

Patrick Riddle was retained as defense counsel for these actions. As discussed in further detail below, the parties dispute whether Cal Water independently retained Riddle or whether he was assigned to defend the action by Wausau. Cal Water asserts that the State had informed Cal Water by letter in 1996 letter that its pumping operations had contributed to the PCE contamination within the Central Plume and that Wausau, upon tender of the letter, assigned Patrick Riddle as counsel.

### D. DTSC Allegations Against Cal Water and Settlement of Underlying Lawsuits

DTSC originally filed the *City of Chico* and *Payless* actions in February and October 2002 respectively against various businesses it alleged had discharged PCE into drains and sewers in the downtown business district. The complaints also named the City of Chico, alleging that defects in its sewer system allowed the PCE to escape into the groundwater. The DTSC amended its complaints in the actions in December 2002 to add Cal Water as a defendant. Prior to amending its complaint, the DTSC sent a letter to Cal Water dated October 9, 2002, clarifying its contentions regarding Cal Water's liability for groundwater contamination in Chico. Barber Decl., Ex. 32. The letter stated that with regard to the Central and Southwest plumes in Chico, that "DTSC believes that because CWS wells were screened over the intermediate and lower aquifers, the wells served as a conduit for the contaminants to move from the intermediate to the lower aquifer. Because there were long periods of time when these wells were not operating, the problem was exacerbated." *Id.*

In its amended complaint in the *City of Chico* action, DTSC alleged that various facilities had used and may have been continuing to use PCE "in a manner resulting in releases to the soil and/or groundwater" in the central business district of Chico. RJN re: Def.'s CC, Ex. A, Am. Compl., *City of Chico* action ¶ 22. It alleged that releases from those facilities "may have occurred through a variety of mechanisms, including but not limited to, direct releases into the ground at facilities and releases into sewer connections at the facilities." *Id.* ¶ 23. As to Cal Water, the complaint alleged, "[p]ublic waters supply wells owned and/or operated by the California Water Service Company, including but not limited to wells known as CWS-2, CWS-10, and CWS-21 contained water contaminated with hazardous substances and released hazardous substances to surrounding groundwater." *Id.* ¶ 24. As to its claim under CERCLA, DTSC alleged that "[e]ach

1  defendant owned and/or operated a facility from which there were releases of hazardous substances

2  within the meaning of section 107(a)(1)-(2) of CERCLA, 42 U.S.C. section 9607(a)(4)." *Id.* ¶ 40.

3       The allegations in first amended complaint in the *Payless* action are similar, except that the

4  alleged actions resulted in releases "in the soil and groundwater underneath an approximately two-

5  mile area southwest of the central business district" of Chico.  RJN re: Def's CC, Ex. B, First Am.

6  Compl., *Payless* action ¶¶ 27, 29.  The allegations directed toward Cal Water are that it "owned

7  and/or operated public water supply wells, including but not limited to a well known as CWS-46,

8  that contained water contaminated with hazardous substances and released hazardous substances to

9  surrounding groundwater.  *Id.* at 25; *see also id.* ¶ 40.

10      In October 2006, a final consent decree was agreed upon for the *City of Chico* litigation

11  involving the Central Plume.  Under the consent decree, Cal Water is obligated to:

12      •  Design the water distribution system and pumps to be used as part of the

13          extraction for the Central Plume remediation (the State will locate and

14          construct new extraction wells as part of the distribution system);

15      •  Pay for and construct pipelines between the new extraction wells and the Cal

16          Water distribution system;

17      •  Operate the state's extraction wells, including payment of utility and

18          maintenance for thirty years.

19  McCaulkey Decl., Exs. B, C.  A consent decree in the *City of Chico* action was approved by the

20  court on May 23, 2007.  A similar consent decree was approved in the *Payless* action on August 13,

21  2007.

22      **E.      The Instant Action**

23      On June 6, 2006, Wausau initiated the present action against Cal Water seeking

24  (1) declaratory relief, pursuant to 28 U.S.C. § 2201, that it has no duty to defend Cal Water in the

25  Underlying Actions; (2) declaratory relief, pursuant to 28 U.S.C. § 2201, that it has no duty to

26  indemnify Cal Water for liability incurred related to the Underlying Actions; (3) reimbursement for

27  fees and costs expended in defending Cal Water; and (4) damages related to allegedly unpaid

28

premiums under policies which provide for "retrospective premiums." Subsequently on August 14,

2006, Wausau filed an amended complaint containing three causes of action, entitled "Declaratory

Relief—No Duty to Defend Chico Plume Matters," "Declaratory Relief—No Duty to Indemnify

Chico Plume Matters/Lawsuits," and "Contract Damages Arising from Defense Costs."

## II. ANALYSIS

### A.    Estoppel Based Upon Failure to Provide *Cumis* Counsel

As an initial matter, Cal Water seeks to estop Wausau from asserting certain coverage

defenses based on Wausau's alleged breach of its duty to provide *Cumis* counsel. An insurer must

provide a full defense by competent counsel as part of its duty to defend. The duty is breached

where an insurer furnishes defense counsel whose ability to represent the insured is impaired by a

disqualifying conflict of interest. Where there is a disqualifying interest, the insured is generally

allowed to hire independent counsel at the insurer's expense. *San Diego Navy Fed. Credit Union v.*

*Cumis Ins. Society, Inc.*, 162 Cal. App. 3d 799, 810 (1984). California has codified this duty for an

insurer to provide independent, or *Cumis*, counsel in Cal. Civ. Code § 2860(a):

> If the provisions of a policy of insurance impose a duty to defend upon an insurer and
> a conflict of interest arises which creates a duty on the part of the insurer to provide
> independent counsel to the insured, the insurer shall provide independent counsel to
> represent the insured unless, at the time the insured is informed that a possible
> conflict may arise or does exist, the insured expressly waives, in writing, the right to
> independent counsel.

Cal Water asserts that Wausau created a conflict of interest by appointing Patrick Riddle as

Cal Water's defense counsel and only thereafter informing Cal Water that Wausau was invoking a

reservation of rights. It contends that Wausau failed to inform it of its right to independent counsel

or obtain a written waiver and that, accordingly, Wausau should be estopped from raising any

coverage defense that depends on the facts and theories from the underlying litigation that were

obtained by Riddle including whether the pollution was caused "suddenly and accidentally."

Cal Water bases its claim that it was not provided independent counsel or fully advised of its

right to such counsel on the fact that Attorney Riddle was retained by Wausau when Cal Water first

received notification that DTSC viewed Cal Water as a PRP. Before Cal Water was named in the

underlying actions, it was identified as a PRP by a letter dated January 9, 1996 from DTSC

regarding contamination of groundwater in the Chico area. Cal Water's defense of the PRP letter was tendered to Wausau in February 1996. Wausau accepted the defense under a full reservation of rights in a letter sent in February 1997.

Attorney Riddle was assigned to represent Cal Water, with Cal Water's agreement, in June 1997 by Wausau. It is undisputed that Wausau paid Riddle's bills. However, Attorney Riddle viewed himself as Cal Water's attorney. In a March 3, 1997 letter to Cal Water's insurance broker, Attorney Riddle advised:

> Let me make it clear that we do not represent Wausau Insurance Company. . . . We take no direction from Wausau Insurance Company after we accept a defense, nor do we seek authority from them how we are going to defend the insured. We work strictly for the insureds, Wausau merely pays the bills.

Smith Decl., Ex. 5.

In 1999, Wausau discontinued providing a defense for Cal Water in light of the decision in *Foster-Gardner, Inc. v. Nation Union Fire Insurance Company of Pittsburgh, PA*, 18 Cal. 4th 857 (1998), which held that an administrative agency notice identifying the recipient as a party potentially responsible for environmental pollution, and directing the recipient to assume responsibility for remediation of the pollution, does not trigger an insurer's duty to defend the recipient under a comprehensive general liability (CGL) policy. However, Attorney Riddle continued to represent Cal Water, as Cal Water entered into a separate retainer agreement with him. Wausau demanded reimbursement of its legal expenses paid to the date of its withdrawal in 1999. Cal Water and Wausau settled their dispute over the coverage obligation, if any, Wausau had arising from the matters raised in the January 9, 1996 PRP letter in a Settlement Agreement & Release dated January 2001 ("January 2001 Settlement"). It provides in relevant part:

> California Water Service Company agrees to release Wausau from any activities related to the investigation, handling, decision to pay or not to pay any cost, including defense costs, based upon the implied covenant of good faith and fair dealing, bad faith, statutory consumer protection act or any similar or related Claim with respect to any Wausau activity occurring prior to the date of this agreement with respect to matters for this Claim, policies, and or [sic] retrospective premium or variable deductible plans.

Smith Decl., Docket # 47, Ex. A ¶ B.4.

After Cal Water was brought into the underlying actions, Cal Water's insurance broker again

1  tendered the defense of Cal Water to Wausau and noted that Cal Water had retained Attorney Riddle

2  to protect its interests. On January 29, 2003 Wausau responded by agreeing to defend Cal Water

3  pursuant to a full reservation of rights including reimbursement of defense expenses paid on behalf

4  of Cal Water. Paul Ekstrom, Corporate Secretary of Cal Water, responded with his own reservation

5  of rights letter and stated that he would forward Wausau's letter to "our" defense counsel (Riddle).

6  Wausau then provided a defense for Cal Water pursuant to a reservation of rights with Attorney

7  Riddle as Cal Water's defense counsel.

8       Even assuming that Attorney Riddle's representation of Cal Water in connection with the

9  PRP letter involved a potential conflict of interest since Wausau chose Riddle and paid his bills, Cal

10 Water released any such claim in the January 2001 Settlement. It appears clear that when Cal Water

11 tendered the defense of the Underlying Actions to Wausau, Attorney Riddle had already been

12 independently retained by Cal Water and was acting as its attorney. Therefore, Cal Water cannot

13 reasonably argue that it was denied representation by an attorney of its choice. Further, there is no

14 evidence that Attorney Riddle acted in any way contrary to the best interests of Cal Water.

15      Independent counsel is required where there is a reservation of rights "and the outcome of

16 that coverage issue can be controlled by counsel first retained by the insurer for the defense of the

17 claim." Cal. Civ. Code § 2860(b). The mere fact that the insurer disputes coverage and is defending

18 on a "reservation of rights" basis does not preclude insurer-appointed counsel from providing a

19 quality defense. *Dynamic Concepts, Inc. v. Truck Ins. Exch.*, 61 Cal. App. 4th 999, 1007 (1988);

20 *Golden Eagle Ins. Co. v. Foremost Ins Co.*, 20 Cal. App. 4th 1372, 1394 (1993). The conflict must

21 be "significant, not merely theoretical, actual, not merely potential." *James 3 Corp. v. Truck Ins.*

22 *Exch.*, 91 Cal. App. 4th 1093, 1101 (2001) (quoting *Dynamic Concepts*, 61 Cal. App. 4th at 1007).

23 Cal Water has not shown that Attorney Riddle was other than its independent choice of counsel or

24 that Riddle acted in any way contrary to the interests of Cal Water.

25      Cal Water has submitted a surreply in which it asserts that Riddle, Russell Juncal (Wausau's

26 retained expert), and Bryan Barber (Wausau's current counsel) had intertwining business

27 relationships and those relationships bolster its contention that Riddle was not independent counsel

28 chosen by Cal Water. Although the past relationship among Riddle, Juncal and Wausau's counsel is

not entirely clear, the court does not find that Cal Water has shown that Wausau should be estopped from asserting its coverage defenses based upon those past relationships.[5]

Finally, even were the court to decide that Riddle was appointed by Wausau and that there was an actual conflict significant enough to require Wausau to inform Cal Water of its right to independent counsel, it would not find estoppel to be appropriate. Riddle viewed himself as Cal Water's representation and there is no evidence that Riddle acted other than in the best interest of Cal Water. Cal Water's Motion for Partial Summary Judgment or in the Alternative to Strike Certain Defenses (Docket # 104) is denied.

**B.      Standard for Determining Duty to Defend**

Wausau seeks summary judgment that it had no duty to defend Cal Water because the pollution exclusion precludes coverage. Cal Water opposes Wausau's motion and separately moves for summary judgment that Wausau had a duty to defend and that Cal Water is entitled to indemnification, specifically reimbursement for the amounts it is obligated to pay pursuant to the consent decrees.

The California Supreme Court has set forth the standard for determining a carrier's duty to defend:

> When an insured successfully moves for summary judgment that the insurer owes a defense duty, the insurer's duty is clear. If an insurer successfully moves for summary judgment that it owes no duty to defend, the absence of a duty is clear. But an unfavorable ruling on the insured's motion does not establish the absence of a defense duty; it merely means that the question whether the insurer must defend is not susceptible of resolution by undisputed facts, but instead must go to trial. In the interim, presumably there continues to exist a potential for coverage and thus a duty to defend . . . . when the evidence adduced in the declaratory relief action does not permit the court to eliminate the possibility that the insured's conduct falls within the coverage of the policy, the duty to defend is then established, absent additional evidence bearing on the issue.

*Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 301 (1993) (internal quotations omitted).

_____

[5] Further, even if Riddle had been retained by Wausau after the tender of the Underlying Actions by Cal Water, Cal Water made no objection to, and expressed no reservations about, Riddle's advocacy on behalf of Cal Water and undoubtedly assumed that Riddle would continue the same advocacy for Cal Water that he had been providing pursuant to his retention agreement with Cal Water.

The insurer's duty to defend runs to claims that are merely potentially covered in light of facts alleged or otherwise disclosed. The duty to defend "extends beyond claims that are actually covered to those that are merely potentially so – but no further." *Buss v. Superior Court*, 16 Cal. 4th 35, 45-46 (1997) (citing *Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 287, 659 n. 9 (1993) and *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.*, 45 Cal. App. 4th 1, 107-108 (1996)). "[I]n an action wherein none of the claims is even potentially covered, the insurer does not have a duty to defend." *Id.* at 47. "[I]n a 'mixed' action, in which some of the claims are at least potentially covered and the others are not, the insurer has a duty to defend as to the claims that are at least potentially covered, having been paid premiums by the insured therefor, but does not have a duty to defend as to those that are not, having not been paid therefor." *Id.* at 47-48.

An insurer must defend a mixed action in its entirety prophylactically. *Id.* at 49. The duty to defend arises on tender of the defense and lasts until either the conclusion of the underlying lawsuit or until the insurer can establish conclusively that there is no potential for coverage (and thus no duty to defend). *Montrose*, 6 Cal. 4th at 295; *Amato v. Mercury Cas. Co.*, 53 Cal. App. 4th 825, 832 (1997). Further, the duty to defend applies to the entire action, even if the suit involves a single claim that is only partially covered by the policy. *Presley Homes v. Am. States Ins. Co.*, 90 Cal. App. 4th 571, 575 (2001).

An insurer may not seek reimbursement for claims that are potentially covered. *Buss*, 16 Cal. 4th at 49-50. However, the insurer may seek reimbursement for defense costs as to claims that are not even potentially covered. *Buss*, 16 Cal. 4th at 50.[6] The insurer carries the burden of proof by a preponderance of evidence that defense costs are attributable to claims that are not potentially covered. *Id.* at 53; *Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal. 4th 38, 57 (1997).

Under California law, "the duty to defend arises when the facts alleged in the underlying complaint give rise to a potentially covered claim regardless of the technical legal cause of action pleaded by the third party." *Cort v. St. Paul Fire and Marine Ins. Companies, Inc.*, 311 F.3d 979,

---

[6] An insurer may not seek reimbursement unless it has reserved its right to reimbursement of defense costs. *Buss*, 16 Cal. 4th at 61. Here, the parties do not dispute that Wausau provided a defense under a reservation of rights.

983 (9th Cir. 2002) (citing *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510 (2001)).

Courts first determine whether insurers have a duty to defend by comparing the allegations of the complaint with the terms of the policy. *Waller v. Truck Ins. Exchange*, 11 Cal. 4th 1, 19 (1995); *Kazi v. State Farm Fire & Cas. Co.*, 24 Cal. 4th 871, 879 (2001). However, it is clear that the courts may look beyond the allegations of the complaint: any extrinsic facts known from any source can trigger a duty to defend, even where the complaint does not facially indicate a potential for coverage. *Watts Indus. v. Zurich Amer. Ins. Co.*, 121 Cal. App. 4th 1029, 1039 (2004). "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Montrose*, 6 Cal. 4th at 299-300.

Nevertheless, an insured may not trigger the duty to defend by speculating about extraneous facts regarding potential liability or ways in which the third party claimant might amend the underlying complaint at some future date. The issue is what facts the insurer knew at the time the insured tendered the defense of the underlying lawsuit, both from the allegations on the face of the third party complaint and from extrinsic information available to it at the time, and whether those known facts created a potential for coverage under the terms of the policy. *Low v. Golden Eagle Ins. Co.*, 99 Cal. App. 4th 109, 113 (2002); *see also Gunderson v. Fire Ins. Exchange*, 37 Cal. App. 4th 1106, 1114 (1995) ("[T]he issues here are what facts respondent knew at the time appellants tendered the defense of the [underlying] lawsuit, both from the allegations on the face of the third party complaint, and from extrinsic information available to it at the time; and whether these known facts created a potential for coverage under the terms of the Policy.").

C.    **Effect of the Pollution Exclusion on the Duty to Defend**

1.    **Property Damage Coverage Under the Policies**

The Wausau policies promised to defend any suit against Cal Water seeking damages covered by the policies. The insuring agreement of the policies covering 1966 to 1969 provided that Wausau would "pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the loss or damage to or destruction of property of others . . . sustained or alleged to have been sustained during the policy period and arising from any cause whatsoever out of the operations, activities, work and/or business of the insured." In 1969 the policy language was

changed slightly but contained the same obligation:

>   1.  The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:
>
>   Coverage C — Bodily Injury or
>   Coverage D — Property Damage
>
>   To which this insurance applies, caused by an occurrence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . .

It is clear that the above language requires Wausau to defend and indemnify Cal Water from claims made by DTSC for property damage sustained during a policy period before 1986, absent an applicable exclusion.

### 2.    The Pollution Exclusion

From January 1, 1972 to January 1, 1986, each of the policies contained an exclusion for personal injury or property damage caused by pollution:

> This insurance does not apply:
>
> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.[7]

The parties do, however, disagree as to whether coverage is available under the pre-1972 Wausau policies that do not include a pollution exclusion.

### 3.    Were the Alleged Polluting Events "Sudden and Accidental"?

One of the parties' fundamental disputes is whether the "sudden and accidental" discharge of pollutants refers to the alleged discharge of PCE's by third party dry cleaners and others or whether it applies to the dispersing activities of Cal Water. Discovery in the underlying *City of Chico* case revealed that a number of spills or disposals of PCE into the sewer or directly into the soil in the central plume occurred between 1968 and 1982. If the polluting event for purposes of determining coverage is that of Cal Water, then the pollution exclusion would appear to exclude coverage

---

[7] This form of the exclusion is sometimes called the "qualified pollution exclusion." *Travelers Cas. & Sur. Co. v. Superior Court*, 63 Cal. App. 4th 1440, 1448 (1998).

because Cal Water's activities did not result in discharge that was "sudden and accidental." On the other hand, the alleged toxic spills by the third party dry cleaners could perhaps qualify as "sudden and accidental." The basis of liability of Cal Water asserted by the DTSC in the *City of Chico* and *Payless* actions is "CWS owned and/or operated public water supply wells . . . that contained water contaminated with hazardous substances and released hazardous substances to surrounding groundwater." First Am. Compl. Payless Action ¶ 25; Am. Compl. City of Chico Action ¶ 24 (same). Therefore, the alleged release and dispersal of pollutants from the wells into the groundwater serves as the basis of the alleged liability of Cal Water to DTSC. However, the basis for liability is a different inquiry than the question of whether the discharge of pollutants was sudden and accidental for the purposes of determining the applicability of the pollution exclusion.

In *Standun, Inc. v. Fireman's Fund Ins. Co.*, 62 Cal. App. 4th 882, 889 (1998), the court determined what constituted the relevant polluting event for the purpose of the sudden and accidental exception to the pollution exclusion. The insured sought coverage for cleanup of toxic waste released from a landfill site. The insured was not the operator of the landfill, rather, the insured had caused to be delivered to the landfill the toxic waste that eventually caused the pollution. The California Court of Appeal was asked to determine what the relevant discharge of pollutants was for purposes of the pollution exclusion: the disposal of waste at the site (as the insurers argued) or the escape of the pollutants into the surrounding environment (as the insured argued). *Standun*, 62 Cal. App. 4th at 889. To resolve the question, the court examined, among other things, the language of the pollution exclusion in question. Noting that "[t]he pollution exclusion focuses on the discharge of pollutants into or upon the land, air or water and not on the environmental damage caused by the discharge," the court determined that the relevant release was the deposit of the hazardous waste material into the landfill, because a deposit into a landfill is a release or discharge onto land. *Id.* at 890-91. "Where hazardous waste material is deposited directly into a landfill, the relevant discharge of pollutants for purposes of the pollution exclusion is the initial release of the hazardous waste into the landfill, not the subsequent release of pollutants from the landfill into the water, air and adjoining land." *Id.* at 891. Therefore, the court affirmed the trial court's determination that the exclusion applied. "Each and every discharge of pollutants by Standun

into the environment at the OII landfill was the result of Standun's purposeful and regular shipment of its liquid wastes to the OII landfill. There were no sudden and accidental discharges of Standun's pollutants into the landfill." *Id.* at 892. In the present case, the relevant discharge for coverage purposes was that by the third party dry cleaners and not the subsequent activities of Cal Water which spread the environmental contamination caused by the initial allegedly sudden and accidental spills by the dry cleaners. There is nothing in the pollution exclusion suggesting that it is the conduct of the insured that must be sudden and accidental for the exception to the exclusion to apply.

### 4. Pre-1972 Policies

Although the Wausau policies issued prior to 1972 did not include a pollution exclusion, Wausau nevertheless asserts that there is no evidence that any PCE contamination reached Cal Water's wells before 1972, and thus that no occurrence happened during any policy period before 1972, when the pollution exclusion first appeared. Cal Water, on the other hand, seeks summary adjudication that coverage is available under the pre-1972 policies. Here, the burden is on Cal Water as the insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage. *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1189 (1998) ("the 'sudden and accidental' exception is properly construed as a coverage provision when allocating the burden of proof").

Wausau points out that the discovery of PCE in Cal Water's wells did not occur until 1984. It contends that pursuant to a declaration submitted by Cal Water's defense attorney in support of its motion for approval of the consent decree between DTSC and Cal Water, that Cal Water's experts believed no contamination could have reached Cal Water's wells in the Central Plume until approximately 20-60 years after the first release of PCE by the dry cleaners. RJN, Ex. G, ¶ 7-17, Decl. of Paul Sheldon Supp. Plf's Mot for Approval and Entry of Consent Decree (*City of Chico* Action). It argues that because there is no evidence that any of the dry cleaning businesses in the *City of Chico* action was in business before 1954, that none of the contamination could have occurred until after 1972, the year the pollution exclusion first appeared in Cal Water's policies with Wausau. With regard to the *Payless* action, Wausau contends that the evidence establishes that well

1   46, the only well at issue in that action, was not drilled until 1972 or 1973, therefore the

2   contamination could not have been dispersed by Cal Water's actions until after the inclusion of the

3   pollution exclusion in the 1972 policy.

4         Cal Water, by contrast, submits a declaration by its expert, Patrick Hubbard, that there were a

5   number of contributory sources to the releases of PCE.  Based on his review of environmental

6   reports and modeling performed in the Underlying Actions, he concludes that the following were

7   some of the sources of PCE releases:

8           •      Commercial operations and facilities, especially numerous dry cleaner

9                 facilities, including Flair Cleaners, Empire Cleaners, Norge Cleaners,

10                Esplanade Cleaners, Wascomat, College Cleaners, Payless Cleaners, and/or

11                Crown Cleaners (from the 1920s through at least the 1980s);

12          •      School operations and facilities, including wells, at Chico [schools] (from the

13                1920s through at least the 1980s)

14          •      Industrial operations and facilities, including Victor Industries (from 1958

15                through 1984)

16  Decl. of Patrick Hubbard Supp. Cal Water's Mot. Partial Summ. J., Docket # 229, ¶¶ 4-5.  Taken as

17  true, at least some of these sources of groundwater contamination would have been present before

18  1954.  Viewing this evidence in the light most favorable to Cal Water, the court concludes that there

19  is a possibility that some of the pollution damage occurred before 1972, the year Wausau's policies

20  first included a pollution exclusion.

21            **5.**      **1972-1985 Policies**

22        The parties do not dispute that each of the relevant Wausau Policies from 1972 through 1985

23  included a pollution exclusion which states that the policy does not apply "to bodily injury or

24  property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot,

25  fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants,

26  contaminants or pollutants into or upon land, the atmosphere or any water course or body of water."

27  And for purposes of this motion, they do not contest that the type of damage to the groundwater

28  claimed here falls within the definition of such property damage.  *See* Wausau's Opp. to Cal Water's

Mot. re: Duty to Defend at 13 ("It is not disputed that the claims asserted in the *City of Chico* and *Payless* cases involve pollution – the DTSC alleged the Cal Water was responsible for the discharge, dispersal, release o[r] escape of a pollutant (PCE)."). The parties also do not dispute that the exclusion does not apply "if such discharge, dispersal, release or escape is sudden and accidental." The parties' dispute is thus whether there was in this case a discharge, dispersal, release or escape of PCE that was sudden and accidental such that the exclusion does not apply, and coverage is available under the 1972-1985 Wausau policies.

"The 'sudden and accidental' exception creates coverage where it would otherwise not exist and thus the insured's burden of proving coverage extends to proof of this exception." *Aeroquip Corp. v. Aetna Casualty & Surety Co., Inc.*, 26 F.3d 893, 894-95 (9th Cir. 1994); *Aydin Corp.,* 18 Cal. 4th at 1193. Wausau contends that Cal Water cannot identify any sudden and accidental discharges of pollutants that would be covered under the Wausau policies.

Under California law, a sudden and accidental discharge is one that is abrupt, unexpected and unintended. *See, e.g., Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 755 (1993). Gradual pollution has been held to be unambiguously excluded from coverage. *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.*, 17 Cal. App. 4th 1773, 1787 (1993); *see also Standun, Inc. v. Fireman's Fund Ins. Co.*, 62 Cal. App. 4th 882, 889 (1998) ("'Sudden' has a temporal element and does not mean a gradual or continuous discharge. 'Accidental' means an unexpected or unintended discharge, not unexpected or unintended damage.") (citations omitted).

Cal Water asserts releases of PCE were sudden and accidental under two different theories: (1) Cal Water's pumping operations, specifically the starting and stopping of the affected pumps, caused numerous occurrences that caused sudden movements of water between the intermediate aquifer contaminated by PCE by the drycleaners' activities to the deeper aquifers, such that any of these sudden movements could have been the original cause of the contamination to the deeper aquifer for which DTSC sought to hold Cal Water liable, and (2) the discharges by the dry cleaners were sudden and accidental.

Cal Water's theory that its operations running and shutting down its pumps in the affected wells over the years caused hundreds or thousands of sudden movements of water between the

aquifers is without merit. As an initial matter, the parties dispute whether the DTSC's theory of liability pertains only to the gradual seepage of PCE from Cal Water's allegedly improperly decommissioned wells into the groundwater (its "wells as conduits theory") or also could be viewed as including the theory that Cal Water's pumping operations caused the groundwater contamination by moving the plumes of PCE contamination into the previously-uncontaminated aquifer (the "horizontal migration theory"). Contrary to Wausau's argument, the DTSC's allegations in the Underlying Actions – as asserted both in its amended complaints the *Payless* and *City of Chico* actions, and in the correspondence between Cal Water and DTSC prior to Cal Water being named as a defendant – are broad enough to encompass both the wells as conduits and horizontal contamination theories.

Cal Water contends that its operation of the wells resulted in sudden movements of water that fall within the exception to the pollution exclusion. Cal Water contends that the operation of the wells, stopping the pumping from the wells in times of low water demand and restarting the pumping in times of higher demands, created sudden movements of water between aquifers. But even if it is true that one of these regular shutdowns may have caused the introduction of the PCE contamination into the deeper aquifers, the undisputed facts are that this operation of the pumps were part of Cal Water's ordinary business and, as such, were intentional rather than accidental under the policy. The shutdowns of the pumps and the resumption of their operations were purposeful and regular and therefore dispersal of pollutants as a result of those operations was neither sudden nor accidental. Thus, coverage is barred by the pollution exclusion. *See Standun*, 62 Cal. App. 4th at 892.

Cal Water also asserts with respect to the *Payless* action, that the drilling of well 46 in 1972 may have caused a sudden and accidental release of PCE-contaminated water from the intermediate aquifer to the deeper aquifer. Aside from argument of counsel and the fact that the well was drilled in 1972, Cal Water presents no support for this theory. Because it is entirely speculative, the court declines to consider this theory as a basis for a sudden and accidental release necessary to satisfy the exception to the pollution exclusion.

[T]he insured must do more than point to possible intervening events [ ] to support a

claim for coverage under the sudden and accidental exception. [citation omitted] The insured must show that the intervening event was sudden and accidental and did not arise from the disposal of wastes in the ordinary course of business. [citation omitted] The insured must also show that an appreciable amount of environmental damage was caused by the intervening event, over and above that caused by routine dumping into the disposal site.

*Travelers Cas. & Sur. Co. v. Superior Court*, 63 Cal. App. 4th 1440, 1460 (1998).

Cal Water's second theory does not depend on Cal Water's activities being sudden and accidental. Rather, it claims that since there were sudden and accidental discharges by dry cleaners and other third parties, the exception to the exclusion applies. Cal Water's evidence as to the contribution of sudden and accidental spills by dry cleaners and others as opposed to the disposal of pollutants in the regular course of business is problematic. Cal Water appears to acknowledge that many of the discharges by the dry cleaner facilities were made as part of their routine operations. Nevertheless, it points to a number of discharges by two of the dry cleaners, Flair Custom Cleaners and Esplanade Cleaners, that may qualify as sudden and accidental. Cal Water's Mot. re: Duty to Defend at 6. These alleged sudden and accidental releases include five or six spills of PCE of 3 to 4 gallons each from April 1968 through September 1976 by Flair and 1 to 5 gallon spills once every 5 or so years by Esplanade.

Regardless of which party bears the burden of proof when indemnification is at issue, when the defense duty is implicated . . . [the insurer] is obligated to defend [the insured] in the underlying . . . if there is any potential that the release or escape of at least some of the pollutants was "sudden and accidental." This matter can only be deemed amenable to resolution by summary judgment at this stage of the proceeding if [the insurer] can produce undisputed evidence precluding that possibility.

*Vann v. Travelers Companies*, 39 Cal.App. 4th 1610, 1616 (1995). Although Cal Water makes no attempt to demonstrate how much, if any, of the environmental damage would have been caused by these spills over and above the routine disposal of the PCE into the water by the dry cleaners, the evidence is enough to defeat summary judgment on the duty to defend.

### D.    Care, Custody and Control Exclusion

Wausau seeks summary judgment that it has no duty to indemnify Cal Water because Cal Water's claims are excluded from coverage under a "care, custody and control exclusion" in the each of the Wausau policies issued to Cal Water from 1956-1988. Between 1959 and 1969, the Wausau policy contains a Special Endorsement excluding coverage for "[d]amage to any property of others

in the care and custody of the insured for storage for sale."  Decl. of John Podesta Opp. Wausau's

Mot. re: Costs, Exs. B-E.  Between 1969 and 1972, the policy stated that "[t]his insurance does not

apply . . . to property damage to: (1) Property owned (2) Property in the care, custody or control of

the insured held for sale or storage."  Between 1972 and 1975, the policy stated that the insurance

does not apply "to property damage to: (1) Property owned (2) Property in the care, custody or

control of the insured held for sale or storage (3) Property occupied by or rented to the insured if

under lease agreement the insured has agreed to provide direct damage insurance."  Finally, between

1975 and 1988, the policy provided that the insurance does not apply "to property damage to: (1)

Property owned by the insured (2) Property in the care, custody or control of the insured held for

sale or storage (3) Property occupied by or rented to the insured if under lease agreement the insured

has agreed to provided direct damage insurance."

Wausau contends that under the language of any of these policies, the action commenced by the DTSC seeks damages to property in the care, custody or control of Cal Water.[8]  Wausau asserts this is so because Cal Water is a purveyor of water, whose business is appropriating water for resale to the general public.  Because water from the contaminated aquifer will eventually pass through the Cal Water system and be sold to consumers, according to Wausau, this means that any property damage must be to water "in the care, custody or control of the insured held for sale or storage."  *See e.g.*, Reply Supp. Mot. re: Costs at 3 ("Water that is within Cal Water's wells has been appropriated and becomes Cal Water's personal property, as discussed in *Watts Industries, Inc. v. Zurich American Insurance Co.*, 121 Cal. App. 4th 1029 (2004).").

Wausau's contention is without merit.  It is clear that the actions commenced by the DTSC sought damages for contamination of the aquifer, not of the water in Cal Water's system.[9]  California

---

[8]  To the extent that Wausau argues that the groundwater contamination occurred to "owned property" as specified in the first section of the application exclusion, Cal Water concedes that it does not seek indemnification for damage to water in its system.  Opp'n Wausau's Mot. re: Costs at 6.

[9]  Cal Water agrees that the exclusion applies to water that is already in the Cal Water distribution system after having been appropriated from the various wells by pumping.  Opp'n to Wausau's Mot. Summ. J. for Costs at 2.  However, Cal Water was sued by DTSC for damage to the aquifer as a result of the influence of its pumping and non-pumping of its wells on the contaminated plumes.

courts have rejected the argument that groundwater contamination such as that alleged and adjudicated in the *City of Chico* and *Payless* actions falls into "care, custody and control" exclusions in insurance policies. "Water Code § 102 thus expresses the pre-eminent right of the People of the State to make water policy and control water uses; it may perhaps also have been intended as a preemptive strike against any private efforts to 'ownership' in a proprietary sense." *California v. Superior Court*, 78 Cal. App. 4th 1019, 1030 (2000). There is no evidence or assertion that Cal Water owns or exercises exclusive control over the affected aquifers. And even though the consent decrees provide that Cal Water must eventually treat and pump the water from the contaminated aquifers for sale to its customers, it is also clear that the consent decrees are intended to remediate the contamination to the water in the aquifer by making the water fit for human use, not to treat water that is in Cal Water's system and already appropriated for sale to Cal Water customers. Just because the contaminated water may eventually pass through the Cal Water system does not mean that the property damage for which coverage is sought is to property that is in the care, custody or control of Cal Water.

**E. Duty to Indemnify Cal Water for Costs of Compliance with Consent Decrees**

Cal Water seeks a declaration that the claims presented against it in the Underlying Actions by the DTSC constitute covered claims under Wausau Policy Nos. 0629-00-027132 (1/1/66-1/1/69); 0622-00-027132 (1/1/69-1/1/72) and 0625-00-027132 (1/1/72-1/1/75). Specifically, Cal Water seeks to recover estimated costs of compliance with the consent decrees into which it entered regarding the Central and Southwest Plumes to settle the *City of Chico* and *Payless* actions. Cal Water obtained an estimate that it would cost approximately $989,000 to design and construct the additional facilities required under the Central Plume consent decree. It estimates that the total cost of compliance under the Central Plume consent decree, including the operation and maintenance costs over thirty years, is $2,890,008, net present value. Mot. Summ. J. Re: Indemnity at 11 n.2. Cal Water estimates that its cost for compliance under the Southwest Plume consent decree is $1,175,692, net present value.

Wausau seeks a declaration that the Consent Decrees entered into between DTSC and Cal Water do not impose any costs on Cal Water other than normal costs of doing business as part of its

operations with respect to certain wells and, therefore, there is no covered damage  Specifically,

Wausau points to the following language in the relevant policies:

> For 1960-1969:

> Coverage C – Property Damage Liability Other Than Automobile.  To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of liability imposed upon him by the law or assumed by him under any written contract for damages, because of injury to or destruction, including the loss of use thereof, caused by accident.

> For 1969-1988:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies . . .

The question of whether costs incurred pursuant to a consent decree in a water contamination case constitute damages for purposes of similar policy language has already been considered by the Ninth Circuit.  Analyzing California law, specifically the California Supreme Court case of *AIU Ins. Co. v. FMC Corp.*, 51 Cal. 3d 807 (1990), the Ninth Circuit held that costs incurred pursuant to a consent decree are covered damages under a policy that provides coverage for "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies."  *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1564 (9th Cir. 1991) ("[W]e find costs incurred pursuant to a consent decree are covered 'damages.'").

Wausau nevertheless asserts that the consent decrees do not impose any financial obligations on Cal Water beyond its ordinary business operating costs, thus distinguishing *Intel*.  However, it is undisputed that pursuant to the consent decrees, Cal Water is obligated to design wells that will be owned by DTSC as part of the treatment system for Chico's Central Plume and that Cal Water will also need to build pipelines to connect DTSC owned wells to its distribution system.  Even if, as Cal Water has admitted, it will pass the costs of performance under the consent decrees on to its consumers, the costs which would not have been incurred but for the contamination nevertheless constitute damages that are covered under Wausau's insurance policies.[10]

### F.     Breach of Contract

_____

[10]  This does not mean that Cal Water is entitled to recover the costs it would have incurred for pumping, treatment and delivery of water that it would have incurred absent the contamination.

1    As set forth above, the court has determined that there may be coverage available under the

2    Wausau policies.  Therefore, a material issue of fact remains as to whether Wausau is liable for

3    breach of contract, and its motion for summary judgment is denied to the extent its seeks a

4    determination that Cal Water's first counterclaim for breach of contract is without merit must be

5    denied.

6    **G.    Breach of the Covenant of Good Faith and Fair Dealing (Bad Faith)**

7    Wausau asks the court to grant summary judgment as to Cal Water's counterclaim for breach

8    of implied contract of good faith and fair dealing on the basis that there is no coverage under the

9    Wausau Policies for the pollution claims at issue.  Under California law, an insured claiming a

10   breach of the implied covenant of good faith and fair dealing arising from the denial of insurance

11   policy benefits must show that (1) coverage existed under the policy, and (2) that the insurer's failure

12   to  provide the policy benefits was unreasonable or without proper cause.  *Love v. Fire Ins. Co.*, 221

13   Cal. App. 3d 1136, 1151 (1990).

14   The court has determined that coverage may have existed under the Wausau policies.

15   Therefore, the first prong of the breach of the covenant of good faith and fair dealing test has

16   potentially been met.  The question that remains is whether there is a triable issue of fact with

17   respect to the reasonableness of Wausau's conduct.  The reasonableness of an insurer's

18   claims-handling conduct is ordinarily a question of fact, however, "it becomes a question of law

19   where the evidence is undisputed and only one reasonable inference can be drawn from the

20   evidence."  *Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co.*, 90 Cal. App. 4th

21   335, 346 (2001); *see Dalrymple v. USAA*, 40 Cal. App. 4th 497, 514 (1995). "[A]n erroneous

22   interpretation of an insurance contract by an insurer does not necessarily result in tort liability for

23   breach of the covenant of good faith and fair dealing." *Id.*

24   Here, Cal Water essentially predicates its bad faith and punitive damage claims on: (1)

25   Wausau's alleged failure to investigate the circumstances surrounding the pollution which it claims

26   would have shown that the polluting events were sudden and accidental; (2) its claim that Wausau

27   denied Cal Water's right to independent counsel; (3) Wausau's failure to participate in settlement

28   discussions.

The circumstances here do not permit a reasonable inference of bad faith based upon Cal Water's contentions.[11] Wausau's position that the exception to the pollution exclusion does not apply has both reasonable legal and factual support. Cal Water was nevertheless provided with counsel whose loyalties were only to Cal Water. Wausau provided Cal Water with a complete defense and fully paid Cal Water's defense costs of over $1 million. Although Wausau did not participate in the settlement discussions leading to the Consent Decrees, it waived any claim that Cal Water acted as a volunteer when it settled with DTSC and remains potentially liable for Cal Water's damages if coverage is ultimately found.[12] *See American Cas. Co. of Reading, Pennsylvania v. Kreiger*, 181 F.3d 1113 (9th Cir. 1999) (wherein the court reversed the trial court's summary judgment finding that appellant was not an additional insured under a policy but affirmed the ruling that the carrier had not acted in bad faith).

Wausau's motion for summary judgment is granted to the extent it seeks a determination that Cal Water's second counterclaim for breach of the implied covenant of good faith and fair dealing and claims for punitive damages have no merit.

### III. ORDER

For the foregoing reasons, the court:

(1) grants Cal Water's motion for summary judgment that Wausau has a duty to defend Cal Water under the Wausau policies, eliminating Wausau's claim for reimbursement (Docket # 106);

(2) denies Cal Water's motion for summary judgment that Cal Water's claims constituted covered claims under the Wausau policies and that Cal Water is entitled to recover its costs to comply with settlements it entered into with the DTSC (Docket # 108);

---

[11] Since no inference supporting a claim of breach of the covenant of good faith and fair dealing can be drawn, Cal Water is precluded from claiming punitive damages for Wausau's denial of coverage. To be entitled to punitive damages, plaintiff must prove by clear and convincing evidence that Wausau acted with "oppression, fraud, or malice." Cal. Civ. Code § 3294. "The evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different dimension' from that needed to support a finding of bad faith." *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 78 Cal. App. 4th 847, 909 (2000) (citing *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1286 (1994)).

[12] If Cal Water eventually prevails on the coverage issue, there may be a question of whether Wausau can contest the amount of the settlements. However, the court does not reach that issue at this time.

1    (3) denies Cal Water's motion for partial summary judgment that Wausau be prevented from

2 raising the defenses that property damage that was the subject of the underlying cases did not occur

3 until prior to 1972, that Cal Water's conduct was not cause by an "occurrence," and that the pollution

4 exclusion in the post-1972 policies precludes coverage (Docket # 104);

5    (4) denies Cal Water's motion to strike affirmative defenses (Docket # 247);

6    (5) denies Wausau's motion for summary judgment to the extent that it seeks a determination

7 that there is no coverage based on the pollution exclusion of the relevant policies and grants the

8 motion to the extent that it seeks adjudication that Wausau cannot be liable for breach of the

9 covenant of good faith and fair dealing or punitive damages (Docket # 87); and

10    (6) denies Wausau's motion for summary judgment that there is no coverage based on a care,

11 custody and control exclusion in the policies and that coverage does not extend to the type of costs

12 Cal Water has incurred pursuant to the consent decree it has entered into in the underlying lawsuits

13 (Docket # 102).

14    The parties shall appear for a further case management conference on September 12, 2008 at

15 10:30 a.m. to discuss setting this matter for trial.

16

17 DATED:    9/25/08

RONALD M. WHYTE
18                                              United States District Judge

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

1

**Notice of this document has been electronically sent to:**

2

**Counsel for Plaintiff:**

3

Bryan M. Barber          bbarber@barberlg.com
Fulton M. Smith, III     fsmith@barberlg.com

4

**Counsel for Defendant:**

5

John H. Podesta          jpodesta@bbgslaw.com

6

A. Geoffrey Hutchinson   ghutchinson@bbgslaw.com

7

8

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

9

10

**Dated:** _____9/25/08_____          _____/s/ MAG_____

11

                                                **Chambers of Judge Whyte**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28